**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: ) | |
| ) | |
| **A1 MILLENNIUM MARINA, INC.** ) | |
| ) | |
| **Debtor** ) | |
| _____ ) | |
| **JOSEPH BALDI, Trustee,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 13 C 8676** |
| ) | |
| **ANTHONY DISCEPOLO, JR.,** ) | **Judge Rebecca R. Pallmeyer** |
| **individually and doing business as** ) | |
| **IRVING & SHERIDAN SHELL, INC.,** ) | |
| **SANDRA COHEN, T&J AUTO TECH, INC.,** ) | |
| **DIKUJE GROUP, INC. and JOSEPH** ) | |
| **KUTYNA,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Joseph Baldi ("Baldi" or "Plaintiff") is the trustee appointed to administer the bankruptcy estate of A1 Millennium Marina, Inc. (the "Marina"). Baldi filed this lawsuit against Anthony Discepolo, Jr., Sandra Cohen, Irving & Sheridan Shell, Inc., T&J Auto Tech, Inc., Dikuje Group, Inc., and Joseph Kutyna (collectively, the "Defendants") in an attempt to avoid and recover over $600,000 in transfers made by the Marina to Defendants in the four-year period before the Marina filed for Chapter 7 bankruptcy on July 29, 2011. Specifically, Baldi seeks the avoidance and recovery of alleged preferential transfers made by the Marina to its shareholder and president, Anthony Discepolo, and Discepolo's former wife, Sandra Cohen, pursuant to 11 U.S.C. § 547 (Counts I and II); alleged fraudulent transfers made by the Marina to its shareholder, Joseph Kutyna, pursuant to 11 U.S.C. §§ 544, 548, and 740 ILCS § 160/5 (Count III); and alleged fraudulent transfers made by the Marina to Anthony Discepolo, Sandra Cohen, and Anthony Discepolo's three businesses, Irving & Sheridan Shell, T&J Auto Tech, Dikuje Group, pursuant to 11 U.S.C. § 544 and ILCS § 160/5 (Counts IV and V). With respect

to Counts IV and V, Baldi alleges that these transfers were fraudulent because Anthony Discepolo made the transfers while the Marina was insolvent and with the knowledge that they would render the Marina unable to pay its other creditors, including the Marina's landlord, Brown Ridge, LLC, which was owed rental payments from the Marina pursuant to a court order during the same time period.  In Count VIII, Baldi alleges that because Discepolo ignored corporate formalities with respect to the Marina, the court should pierce the corporate veil and hold Discepolo personally liable for the Marina's debts.  Lastly, in Count IX, Baldi alleges that the other Defendants aided and abetted Discepolo in his wrongful conduct by permitting him to fraudulently transfer funds from the Marina.  Baldi moves for partial summary judgment on Counts I, II, IV, and VII.  For the following reasons, that motion is granted in part and denied in part.

## BACKGROUND

A1 Millennium Marina, Inc. is a seasonal marina business that operates on the Little Calumet River in Burnham, Illinois.  (Pl. Statement of Facts, hereinafter "SOF" [28], ¶ 10; Defs. Resp. to Pl. Statement of Facts, hereinafter "Defs. SOF Resp." [32], ¶ 20.)  After a period of financial difficulties spanning several years, the Marina filed for Chapter 7 bankruptcy on July 29, 2011.  (SOF ¶ 12.)  Plaintiff Joseph Baldi was appointed as the Chapter 7 Trustee of the bankruptcy estate.  (*Id.* ¶ 3.)  At the time of the bankruptcy filing, Defendant Anthony Discepolo was a shareholder, director, and president of the Marina.  (*Id.* ¶ 4.)  Defendant Joseph Kutyna was also a shareholder of the Marina.  (2-27-15 Discepolo Dep. at 15-16.) Defendant Sandra Cohen is Discepolo's former wife and a former employee of the Marina, and Defendants Irving & Sheridan Shell, T&J Auto Tech, and Dikuje Group are all businesses owned and controlled by Discepolo.  (SOF ¶¶ 6-7.)

According to Defendants, Anthony Discepolo first became involved with the Marina in

2002, when his father asked him to assist his half-brother, Michael Discepolo,[1] who had purchased the Marina during the previous year with his business partner, Al Spiller. (Defs. SOF Resp. ¶ 4; 2-27-15 Discepolo Dep. at 7-9.) When Anthony Discepolo joined the business as a part owner, the Marina was unprofitable and was spending more cash than it was taking in. (*Id.* ¶¶ 4, 16.) Due to the Marina's cash-flow problems, later that year, the Marina's owners and board of directors—Anthony and Michael Discepolo, Al Spiller, and the fourth part-owner Guiseppe Sarno—adopted a corporate resolution authorizing the Marina to borrow money from Anthony Discepolo, to be repaid within two years, or as soon as the Marina could afford to make the repayment. (*Id.*, Ex. F at 7.)

Anthony Discepolo testified that, in 2003, Joseph Kutyna joined the Marina to assist with operations and was given an equal share of the business, which, prior to Kutyna's arrival, had been owned equally by Anthony and Michael Discepolo, Al Spiller, and Guiseppe Sarno. (2-27-15 Discepolo Dep. at 12-13.) After two years in which there was no recovery of the Marina's profitability or cash flow, Anthony Discepolo terminated his brother, Michael, from all roles at the Marina, and acquired his shares in the company, as well as the shares of Al Spiller. (*Id.* at 13-14.) This change in ownership gave Anthony Discepolo a 60 percent ownership interest in the Marina, while Joseph Kutyna and Guiseppe Sarno each retained their 20 percent interest. (*Id.*) Anthony Discepolo's then-wife, Sandra Cohen, also began working at the Marina as a bookkeeper. (Cohen Dep. at 8-11.)

Around the same time, in 2004, the Marina filed a lawsuit in state court against its landlord Brown Ridge, LLC, alleging that Brown Ridge had breached the lease agreement with the Marina by refusing to allow the Marina to exercise an option to purchase the marina property as provided in the lease. (Pl.'s Mot. [26], Ex. 4; Defs. SOF Resp. ¶ 4.) The Marina alleged that, although it had made several requests for Brown Ridge to provide a closing date for the transaction, Brown Ridge refused to perform under the contract or to sell the property to the

---

[1] It appears from the record that Michael Discepolo also went by the name of Michael Dalageorgas (Defs. SOF Resp. ¶ 4); the court will refer to him as Michael Discepolo.

Marina for the agreed price. (Pl.'s Mot., Ex. 4.) Brown Ridge filed a counterclaim against the Marina and third-party complaint against Anthony Discepolo, his brother Michael, and Al Spiller, requesting rescission of the lease agreement due to fraud and mistake.[2] (*Id.*, Ex. 5.) Brown Ridge also filed a petition to require the Marina to make "use and occupancy" payments pursuant to the lease agreement until final disposition of the litigation, and the state court granted that petition on August 11, 2005. (*Id.*)

The Marina's financial situation continued to deteriorate. While the state court litigation was proceeding, the City of Calumet terminated all business operations at the Marina, and filed a series of enforcement actions against the Marina, citing unsafe structural conditions, lack of certifications, and environmental violations. (Defs. SOF Resp. ¶ 30, Ex. E at 9-12.) As a result of the City's enforcement action, Defendants assert, the Marina was forced to shut down for the 2005 season and spend more than $500,000 to improve conditions on the property. (Defs. SOF Resp. ¶ 30 (citing 4-23-15 Discepolo Dep. at 141-43).) The Marina was able to meet these expenses only through loans advanced by Anthony Discepolo. (*Id.*) Loans from Discepolo and his wife Cohen provided funding for the Marina's remaining operating costs during this period, as well. (*Id.* ¶ 29.)

While loans from Discepolo and Cohen kept the Marina functioning, the state court action between the Marina and Brown Ridge proceeded, putting further strain on the Marina's finances. The Marina won a temporary victory on August 11, 2007, when the state trial court granted summary judgment in favor of the Marina, vacating its earlier order requiring that the Marina pay use and occupancy payments to Brown Ridge. (Pl. Mot., Ex. 6.) On November 24, 2008, however, that decision was reversed and remanded by the Illinois Appellate Court. (*Id.*); *A-1 Millennium Marina, Inc. v. Discepolo*, 385 Ill.App.3d 1120, 970 N.E.2d 124 (1st Dist. 2008). On remand, on June 9, 2009, the trial court reinstated its 2005 order, and directed the Marina to

---

[2] Michael Discepolo and Al Spiller had signed the lease agreement, presumably on behalf of the Marina. (Pl.'s Mot., Ex. 3.) Why they or Anthony Discepolo were parties to Brown Ridge's counterclaim is not explained.

make past-due rental payments to Brown Ridge in the amount of $134,352 by July 31, 2009, and to make future use and occupancy payments of $6,576 per month. (SOF, Ex. 6.)

The Marina never made the court-ordered use and occupancy payments to Brown Ridge. (SOF ¶ 13.) Discepolo testified that he instead directed the Marina's limited financial resources toward payment of other "more important" debts, including repayments to himself and the other Defendants for loans Defendants had made from 2005 through 2011 to permit the business to continue operations. (Id. ¶¶ 15, 30, 31; 4-23-15 Discepolo Dep. at 134-37.) Payment of those loans was appropriate, Defendants assert, because the debts were legitimately owed, and payment would ensure that the Marina would not lose its sources of funding. (Defs. SOF Resp. ¶¶ 16, 29-30.) Discepolo testified, further, that he chose to make these payments, rather than pay the Marina's rent, because he did not consider Brown Ridge's debt a legitimate one; Discepolo had hoped that the state court action between the Marina and Brown Ridge would eventually be resolved in favor of the Marina, resulting in the Marina's ownership of the property and obviating any need for the Marina to make rental payments. (Id. ¶ 16; 4-23-15 Discepolo Dep. at 131, 135.) Because Discepolo did not view the use and occupancy payments to be a legitimate debt, he also stated that he would not have paid Brown Ridge even if the Marina did have enough money to make the payments. (SOF ¶ 18; 4-23-15 Discepolo Dep. at 131.)

The Marina's general ledgers reveal that in the four years preceding its bankruptcy filing, the Marina made a total of $392,322.95 in loan repayments to Defendants:

| Payments to: | 7/30/07-12/31/07 | 1/1/08-12/31/08 | 1/1/09-12/31/09 | 1/1/10-12/31/10 | 1/1/11-7/29/11 | Total |
|---|---|---|---|---|---|---|
| Anthony Discepolo | $0.00 | $15,100.00 | $58,750.00 | $95,650.00 | $23,500.00 | $193,000.00 |
| Sandra Cohen | $0.00 | $12,120.00 | $10,142.95 | $79,750.00 | $700.00 | $102,712.95 |
| T&J Auto Tech | $1,000.00 | $19,450.00 | $11,000.00 | $0.00 | $0.00 | $31,450.00 |
| Dikuje Group | $12,729.00 | $45,131.00 | $7,500.00 | $0.00 | $0.00 | $65,360.00 |

(SOF ¶ 22 (citing Pl.'s Mot., Exs. 14, 15, 16, 17, 18, 19).)  The ledgers also reflect that, in the one-year period preceding its bankruptcy, the Marina made loan repayments to Discepolo in the amount of $52,300 and to Cohen in the amount of $9,700.  (*Id.* ¶ 24.)  According to the Marina's bankruptcy filing, in the one year preceding its bankruptcy, the Marina paid Cohen an additional $11,001, which the Marina did not report as a loan repayment.  (*Id.* ¶ 26.)  Defendants assert that the $11,001 payment to Cohen was reimbursement for monthly business expenses that she had charged to her credit card on behalf of the Marina, not a loan payment.  (Defs. SOF Resp. ¶ 26.)  Cohen explained at her deposition that she had made additional payments on the Marina's behalf by incurring charges for business expenses on Discepolo's American Express credit card, which were then debited from her bank account.  (Cohen Dep. at 67-68.)  The $52,300 payment to Discepolo, Defendants explain, was repayment of two loans, one in the amount of $41,800, and a subsequent loan in the amount of $13,000.  (Defs. SOF Resp. ¶¶ 15, 24.)  Even after those payments, Defendant note, as of the date of the Marina's bankruptcy filing (July 29, 2011), the Marina was indebted to Discepolo for a loan balance of at least $304,601.01.  (*Id.* ¶ 24.)

Baldi challenges the propriety of these payments to Defendants.  According to Baldi, at the time the Marina made its loan repayments to Defendants, the business was insolvent and unable to pay its bills to other creditors as their debts became due.  (SOF ¶ 17.)  The $392,322.95 in loan repayments should have been used to pay the Marina's rent, Baldi asserts, but Discepolo chose to divert the funds to himself and the other Defendants because Discepolo risked "los[ing] everything" if he did not receive the money back from the Marina.  (*Id.* ¶¶ 17, 20.)

The Marina's tax returns reflect the business's dwindling assets in the four years preceding its bankruptcy filing; the Marina reported $38,288 in assets in 2007, $21,607 in assets in 2008, $6,375 in assets in 2010, and zero assets in 2011.  (Pl.'s Mot., Ex. 19.)  In its bankruptcy petition filed on July 29, 2011, the Marina reported assets of $141,758.76, but $2,116,300.11 in liabilities.  (*Id.*, Ex. 10 at 7; SOF ¶¶ 44, 47.)  The petition lists Defendants as

creditors, with claims of $1,931,663.92, and Brown Ridge as a creditor, with a claim of an "unknown" amount. (Pl.'s Mot., Ex. 10 at 20-22, SOF ¶ 54.) On October 26, 2011, the Marina's assets were sold for $20,000 pursuant to a bidding process ordered by the bankruptcy court. (Pl.'s Mot., Ex. 21.)

Baldi filed a complaint against Defendants with the bankruptcy court on July 26, 2013. (Pl.'s Mot., Ex. 22.) On December 4, 2013, Defendants filed a motion to withdraw the reference of the proceeding to this court pursuant to 28 U.S.C. § 157(d) [1], which provides that, upon its own motion or upon a timely motion of any party, a district court may withdraw any bankruptcy court case for cause shown. The court granted Defendants' motion, and after the parties completed discovery, Baldi moved for partial summary judgment on Counts I, II, IV, and VII. (Pl.'s Mot. at 2-5.) In Counts I and II, brought pursuant to 11 U.S.C. §§ 547 and 550(a), Baldi asks this court to make a finding that the Marina made preferential transfers to Discepolo and Cohen during the one-year period preceding its bankruptcy filing in the amounts of $52,300 and $20,771 respectively, and to direct Discepolo and Cohen to pay the costs of these transfers to Baldi. (*Id.* at 2-3.) In Counts IV and VII, brought against Discepolo, Cohen, Dikuje Group, T&J Auto Tech, and Irving & Sheridan pursuant to 11 U.S.C. § 544 and 740 ILCS § 160/5(a)(1), Baldi asks this court to enter an order finding that the Marina made $392,522.95 in fraudulent transfers to these Defendants during the four-year period preceding its bankruptcy filing, and requiring the Defendants to pay the costs of these transfers to Baldi. (*Id.* at 4.) In Count VII, brought against Discepolo and Cohen pursuant to 11 U.S.C. § 548 and 740 ILCS § 160/5(a)(1), Baldi asks this court to enter an order finding that the Marina made $241,450 in fraudulent transfers to Discepolo and Cohen during the two-year period preceding its bankruptcy filing, and requiring Discepolo and Cohen to pay the costs of these transfers to Baldi. (*Id.* at 4-5.)

## DISCUSSION

On a motion for summary judgment, the court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."

*Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In other words, a court may grant summary judgment "where the factual record . . . could not lead a rational trier of fact to find for the non-moving party." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## A.    Counts I and II (Preferential Transfers)

In Counts I and II, Baldi challenges transfers made by the Marina to Defendants Discepolo and Cohen in the amounts of $52,300 and $20,771 respectively during the one-year immediately preceding the Marina's bankruptcy filing. Baldi alleges that these payments were preferential transfers pursuant to the Bankruptcy Code, 11 U.S.C. §§ 547 and 550(a). (Pl.'s Mot. at 3-7.) The relevant Code provisions authorize a trustee to recover preferential transfers made by a debtor before bankruptcy on a showing that the transfer: (1) was "to or for the benefit of a creditor;" (2) was "for or on account of an antecedent debt;" (3) was "made while the debtor was insolvent;" (4) was made "on or within 90 days before the debtor filed his bankruptcy petition," or "between [90] days and one year before the filing of the petition, if such creditor at the time of such transfer was an insider;" and (5) enabled the creditor to receive more than the creditor would have received had the transfer had not been made. 11 U.S.C. §§ 547(b), 550(a).

Defendants concede that the Marina made preferential transfers to Cohen and Discepolo during the one-year period before the Marina's bankruptcy filing, but they contest the amount of these transfers. (Defs. Mem. [33] at 4.) Regarding the $52,300 transferred to Discepolo (Count I), Defendants contend that Discepolo is entitled to a $13,000 "setoff" under the "subsequent new value" exception provided in § 547(c)(4). (*Id.*) Under this exception, a trustee is not entitled to recover a preferential transfer to the extent that the creditor who received the transfer subsequently provided "new value" to the debtor and did not receive any

8

additional transfers after providing that value. 11 U.S.C. § 547(c)(4). The subsequent new value exception applies in this case, Defendants assert, because Discepolo loaned $13,000 to the Marina after he had received his final loan repayment from the Marina. (Defs. Mem. at 5.) Baldi agrees that Discepolo is entitled to a $13,000 credit under § 547(c)(4), and that his preference claim against Discepolo should be reduced to $39,300 as a result. (Pl.'s Reply [37] at 11.)

Count II, the claim for $20,771 paid by the Marina to Cohen in the year prior to the Marina's bankruptcy filing, is disputed. Defendants argue that $11,071 of these payments do not qualify as preferential transfers under § 547(b) because they were not made "for or on account of an antecedent debt." (Defs. Mem. at 4.) Rather, the payments were made to Cohen on a current basis in order to reimburse her for expenses she had charged to her American Express credit card on behalf of the Marina. (*Id.*) In response, Baldi contends that Defendants have "not submitted [any] evidence" that the Marina paid Cohen $11,071 as reimbursement for expenses she had incurred on behalf of the business. (Pl.'s Reply at 12.) Specifically, Defendants have not provided American Express card statements or any other evidence that an American Express card belonging to Cohen was used for Marina business expenses, Baldi notes. (*Id.*)

Baldi is correct that that there is no documentary evidence in the record concerning these payments. Defendants did not provide the court with the American Express card statements, but Cohen did testify in her deposition that from time to time she would make business charges on Discepolo's American Express credit card, which would then be debited from her bank account. (Cohen Dep. at 67-68.) Further, it appears that Defendants provided Baldi with the American Express credit card statements in discovery, and Baldi has not explained why the statements provided by Defendants are insufficient. (Defs. SOF Resp., Ex. 3.) The failure of both sides to produce evidence on this issue is disappointing, but what does appear in the record, viewed in the light most favorable to Defendants, could establish that the

Marina paid $11,071 to Cohen to reimburse her for current business expenses, and not on account of an antecedent debt. In other words, there is a genuine issue of material fact as to the amount of preferential transfers made by the Marina to Cohen during this period.

Accordingly, the court grants summary judgment on Count I for the preference claim against Discepolo in the amount of $39,300, and denies summary judgment on Count II for the preference claim against Cohen in the amount of $20,771.

## B. Counts IV and VII (Fraudulent Conveyances)

Within the four years preceding the Marina's bankruptcy filing, the Marina made loan repayments to Discepolo in the amount of $193,000, to Cohen in the amount of $102,712.95, to the Dikuje Group in the amount of $65,360, and to T&J Auto Tech in the amount of $31,450. Baldi seeks avoidance and recovery of these payments, totaling $392,522.95, which he asserts constituted fraudulent transfers under 740 ILCS § 160/5(a)(1) and 11 U.S.C. § 544, and recovery of the same under 11 U.S.C. § 550.[3] Within the two years preceding the Marina's bankruptcy filing, the Marina made $241,450 in loan repayments to Discepolo and Cohen. Baldi also seeks avoidance and recovery of these payments, under 740 ILCS § 160/5(a)(1) and 11 U.S.C. §§ 548 and 550.

The relevant statutory provisions, 11 U.S.C. § 548(a) and 740 ILCS § 160/5(a)(1), allow the avoidance of any transfer of an interest in the debtor's property if there is clear and convincing evidence of "actual fraud," *i.e.*, that the debtor made the transfer "with actual intent to

---

[3] Although Baldi's complaint invokes 740 ILCS § 160/5, his motion for summary judgment specifically asserts that the transfers were fraudulent under 740 ILCS § 160/5(a)(1), not § 160/5(a)(2), which provides that a transfer is fraudulent where a debtor makes the transfer without receiving a "reasonably equivalent value in exchange." Because Baldi did not address § 160/5(a)(2) in his summary judgment briefing, the court declines to address it further. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision.").

hinder, delay, or defraud" another creditor.[4] *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757 (7th Cir. 2012). "Actual intent," for purposes of 740 ILCS § 160/5(a)(1), does not require a showing that the debtor acted with fraudulent intent. *Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005). Rather, a transfer is made with "actual intent" under § 160/5(a)(1) if the transfer "directly tended to or did impair the rights of creditors." *Apollo Real Estate Inv. Fund, IV, L.P. v. Gelber,* 403 Ill. App.3d 179, 193–94, 935 N.E.2d 963, 976 (1st Dist. 2010). A "donor may make a conveyance with the most upright intentions," but if "circumstances are such that the transfer had the effect of [hindering, delaying, or defrauding] creditors, it may be set aside as fraudulent." *Golden Eagle Cmty. Bank v. Rego Grp., Ltd.*, 2015 IL App (2d) 141127-U, 2015 WL 5783290, at *6 (1st Dist. Sept. 30, 2015) (quoting *Birney v. Solomon*, 348 Ill. 410, 415, 181 N.E. 318, 320 (1932)).

In evaluating actual intent, courts refer to factors listed in § 160/5(b), known as the "badges of fraud," to determine whether "'an inference or presumption of fraud'" exists in a particular case. *Wachovia Sec.*, 674 F.3d at 757–58 (quoting *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill. App.3d 241, 251, 662 N.E.2d 595, 602 (1st Dist. 1996)). These "badges" include the following:

    (1)    the transfer . . . was made to an insider;

    (2)    the debtor retained possession or control of the property transferred after the transfer;

    (3)    the transfer . . . was disclosed or concealed;

    (4)    before the transfer was made . . . , the debtor had been sued or threatened with suit;

    (5)    the transfer was of substantially all of the debtor's assets;

    (6)    the debtor absconded;

    (7)    the debtor removed or concealed assets;

---

[4]    11 U.S.C. § 544 does not address fraudulent transfers, but it allows a trustee to step into the shoes of a creditor and avoid a transfer using a state-law cause of action, such as 740 ILCS § 160/5. *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 744 (7th Cir. 2014)

(8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;

(9)    the debtor was insolvent or became insolvent shortly after the transfer was made . . . ;

(10)   the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)   the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 ILCS § 160/5(b). These factors are merely considerations, however, and there is no magic number required in order for a court to make a finding of fraud. *Brandon,* 419 F.3d at 600. The effect of any given factor must be assessed in light of the circumstances. The presence of only one factor, if sufficiently telling, can support a finding of actual intent. *Id.*; *see also In re Chicago Mgmt. Consulting Group, Inc.*, No. 12 B 18139, 2015 WL 5177969, at *7 (Bankr. N.D. Ill. Sept. 3, 2015) (setting aside transfers as fraudulent under 740 ILCS § 160/5(a)(1) where three of the eleven factors were present).

The circumstances here do give rise to a presumption of fraud under 740 ILCS § 160/5(a)(1). Defendants do not dispute that two of the badges of fraud, § 160/5(b) factors (1) and (9), are present: Defendants were "insiders" of the Marina, and the Marina was insolvent at the time the loan repayments were made.[5] (Defs. Mem. at 21.) The fifth 160/5(b) factor is also satisfied in this case because the loan repayments to Defendants constituted "substantially all of the [Marina's] assets." *See* 740 ILCS § 160/5(b)(5). The Marina's tax returns from 2007 through 2011 reflect assets totaling approximately $66,000. During this same time period, the Marina made transfers to Defendants in the amount of $392,322.95, more than five times the amount of the Marina's total assets.

---

[5]    740 ILCS § 160/2(g) defines "insider" as a director, officer, or person in control of the debtor, or a relative of a director, officer, or person in control of the debtor. Under 740 ILCS § 160/3(a), "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."

With respect to § 160/5(b) factor (5), at the time the Marina made the transfers to Defendants, the Marina not only had been "threatened with suit," but "had been sued" for more than $134,352 in outstanding rental payments owed to the Marina's landlord, Brown Ridge. *See* 740 ILCS § 160/5(b)(4). Since 2004, the Marina and its landlord, Brown Ridge, have been involved in litigation relating to the Marina's lease agreement with Brown Ridge; the Marina initially filed a lawsuit against Brown Ridge for breach of their lease agreement, and Brown Ridge counter-sued the Marina, seeking rescission. The lawsuit was still pending at the time the Marina filed for bankruptcy in 2011, but the state court had entered an order six years earlier requiring the Marina to make rental payments to Brown Ridge during the pendency of the litigation. Although the court vacated its order for a two-year period between 2007 and 2009, at the time the alleged fraudulent transfers took place between 2007 and 2011, Discepolo was well-aware both of Brown Ridge's lawsuit and of the fact that the Marina was under a legal obligation to make rental payments to Brown Ridge. Despite this legal obligation, the Marina never made any of these payments, which totaled approximately $290,000, to Brown Ridge. Instead, Discepolo directed the Marina's limited funds so as to transfer some $390,000 to Defendants as repayment for loans that Defendants had previously provided to the Marina.

Defendants suggest that the Marina was not actually required to make payments to Brown Ridge during this timeframe because the court orders in question were subject to possible future vacature, modification, or reversal. (Defs. Mem. at 15.) To the contrary, the Marina was required to comply with all court orders, including the order that it make lease payments to Brown Ridge, so long as those orders were not stayed, reversed or vacated. *See* *Mann v. Calumet City, Ill.*, No. 08 CV 555, 2009 WL 395465, at *16 (N.D. Ill. Feb. 17, 2009) *aff'd*, 588 F.3d 949 (7th Cir. 2009). This means that the Marina was required to make use and occupancy payments to Brown Ridge from 2005 until the date that the Marina filed for

bankruptcy, with the exception of the two-year period between August 2007, when the trial court vacated its 2005 order, and June 2009, when trial court reinstated that order.[6]

Defendants nevertheless urge that the Marina did not act with the intent to hinder, delay, or defraud Brown Ridge under § 160/5(a)(1), citing Discepolo's deposition testimony that he used the Marina's scarce resources to repay Defendants because he viewed Defendants' debts as "more important" than Brown Ridge's rental payments and also believed that repayment of Defendants' loans was necessary to the survival of the Marina's business. (Defs. Mem. at 19-22.) The fact that Discepolo may have subjectively considered the Marina's debts to insiders as more important than the debts owed to Brown Ridge, however, has minimal bearing on the issue of whether Discepolo acted with "actual intent" under § 160/5(a)(1). As mentioned earlier, the question under Illinois law is not whether a debtor acted with fraudulent intent, but rather, whether the transfer did, in fact, directly hinder, delay, or defraud the debtor's creditors. It is clear that, regardless of Discepolo's alleged subjective intentions, his decision to transfer substantially all of the Marina's assets to himself, his wife, and his businesses, at a time when the Marina was insolvent, directly hindered and delayed Brown Ridge's right to receive rent from the Marina. *See, e.g.*, *Chicago Mgmt. Consulting Group*, 2015 WL 5177969, at *7 (setting aside transfers as fraudulent where the payment was made to an insider of the debtor at the time when the debtor was insolvent and was about to file its bankruptcy case).

In any event, the evidence here confirms that Discepolo did, in fact, intend to delay payment to Brown Ridge, even if delaying payment was not his primary motivation for transferring money from the Marina to Defendants. In his deposition, for example, Discepolo asserted that he did not pay Brown Ridge because he did not consider Brown Ridge's debt as a legitimate one; he emphasized that if the Marina were to prevail in its contract claims against

---

[6] Defendants contend that Brown Ridge's litigation posture in state court was "half-hearted" and that Brown Ridge's failure to make more aggressive efforts to require the Marina to make use and occupancy payments demonstrates that there was not a "compelling and immediate need" for the Marina to make these payments. (Defs. Mem. at 11.) Whether Brown Ridge had a "compelling and immediate" need for rent payments does not alter the conclusion that the Marina was under a legal obligation to make those payments during the relevant time.

14

Brown Ridge, it would be excused from any rental obligations. Indeed, Discepolo asserted that he would have refused to make the court-ordered use and occupancy payments even if the Marina could afford to make them because he stood by his belief that the Marina was not under any obligation to pay this money. Discepolo's assertion that he would not have paid Brown Ridge under any circumstances strongly suggests that the Marina's failure to pay rent from 2007 through 2011 was not merely a consequence of the Marina's dire financial situation, but rather, occurred as a result of Discepolo's intentional decision to delay paying rent during this period.

In sum, considering the circumstances of this case, the court finds that these four "badges" of fraud—§§ 160/5(b)(1), (4), (5), and (9)—are adequate to support an inference or presumption that the Marina transferred money to Defendants with the actual intent to hinder, delay, or defraud the Marina's other creditor, Brown Ridge.[7] *Brandon*, 419 F.3d at 600 (noting that, just like the symptoms of a disease, the "symptoms of fraud" provided in § 160/5(b) are not additive, and to treat them as such would be "the equivalent of saying that if there are 11 common symptoms of a serious disease, and a patient only has 5 . . . [then] he is not seriously ill"). Defendants assert that it would be a "slippery slope" for the court to conclude that failure to pay a particular creditor is fraud (Defs. Mem. at 18), and the court agrees—but this is not a case involving the mere failure to pay a particular creditor. Here, the evidence is marked by factors indicating actual fraud—Discepolo transferred almost $400,000, essentially all of the Marina's assets, to himself, his wife, and his businesses, all insiders of the Marina, at a time when the Marina was insolvent, while at the same time refusing to make any of the $290,000 court-ordered rental payments to Brown Ridge. The refusal was intentional: Discepolo defended his

---

[7]     The remaining badges of fraud do not appear to be present. Namely, there is no evidence that the Marina "retained possession or control" of the money it transferred to Defendants, *see* 740 ILCS § 160/5(b)(2); concealed the loan repayments or other business assets, *see* 740 ILCS § 160/5(b)(3); 740 ILCS § 160/5(b)(7); absconded after making the loan repayments to Defendants, *see* 740 ILCS § 160/5(b)(6); failed to receive adequate consideration for the transfers, *see* 740 ILCS § 160/5(b)(8); made the transfers "shortly before or shortly after a substantial debt was incurred," *see* 740 ILCS § 160/5(b)(10); or transferred its "assets to a lienor who transferred the assets to an insider of the [Marina]." *See* 740 ILCS § 160/5(b)(11).

decision on the basis of his belief that Brown Ridge's right to receive rental payments was not legitimate. Discepolo's actions had the effect of delaying and hindering Brown Ridge's rights to receive rent from the Marina, and Discepolo was aware of this fact when he made the payments. The loan repayments made to Defendants must be set aside as fraudulent, and Baldi's motion for summary judgment on Counts IV and VII must be granted.

## CONCLUSION

For the foregoing reasons, Baldi's motion for summary judgment [24, 26] is granted in part and denied in part. The motion is granted with respect to Counts I, and pursuant to 11 U.S.C. §§ 547, 548, and 550(a), Defendants are required to pay Baldi for the costs of this preferential transfer in the amount of $39,300. Baldi's motion is also granted with respect to Counts IV and V, and Defendants are required to pay Baldi for the costs of these fraudulent transfers in the amount of $353,222.95—the amount of the fraudulent transfers ($392,522.95), minus the amount of the preferential transfer made to Discepolo ($39,300). In arriving at this $353,222.95 figure, the court has not taken into account the $13,000 in "new value" that Discepolo had provided to the Marina pursuant to 11 U.S.C. § 547(c)(4); to the extent either party believes that Defendants are required to pay Baldi a greater or lesser amount, they should provide the court with their position on this issue within 28 days. Baldi's motion for summary judgment with respect to Count II is denied.

ENTER:

Dated: March 23, 2016

_____

REBECCA R. PALLMEYER
United States District Judge

16